**REDACTED VERSION**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | | |
|---|---|---|
| KGL FOOD SERVICES WLL | ) | |
| Al Jahra Road and Ghazali Bridge | ) | No.  _____ |
| Shuwaikh, 13106 Kuwait, | ) | |
| | ) | Judge _____ |
| Plaintiff, | ) | |
| | ) | **SUBMITTED WITH A MOTION** |
| v. | ) | **FOR LEAVE TO FILE UNDER** |
| | ) | **SEAL AND SUBJECT TO A** |
| THE UNITED STATES, | ) | **PENDING MOTION FOR** |
| | ) | **PROTECTIVE ORDER** |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF KGL FOOD SERVICES WLL'S
### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This bid protest involves a critical United States Defense Logistics Agency ("DLA") contract for full-line food distribution services supporting military and other federally funded customers located in Kuwait, Iraq, Syria, and Jordan. In January 2018, after a two-plus year procurement involving multiple rounds of proposal submission, evaluations, and discussions, DLA awarded the contract to Plaintiff KGL Food Services WLL ("KGL FS"). DLA documented a comprehensive evaluation and source selection decision, and concluded that KGL FS' proposal provided the best value to the Government.

In subsequent protests at the Government Accountability Office ("GAO"), two disappointed offerors challenged virtually every aspect of DLA's evaluations and award decision. GAO dismissed one protest in its entirety, and denied the overwhelming majority of the second, filed by ANHAM FZCO ("ANHAM"). However, GAO sustained two limited aspects of ANHAM's protest, relating to DLA's evaluation of KGL FS' proposal under the Solicitation's Experience Factor. As will be discussed in greater detail herein, even though DLA

1

was aware of certain experience and reference contracts performed by KGL FS' corporate affiliates—whose resources were committed to and would be utilized on the contract at issue— GAO held that DLA should have ignored that experience and blinded itself to the information before it.

Although DLA vehemently defended its evaluation before GAO, DLA has since taken corrective action to implement GAO's decision. This protest challenges DLA's corrective action. Specifically, this protest explains that DLA's corrective action is inherently arbitrary and capricious and contrary to law as it is expressly based on a GAO decision that is unreasonable— for many of the reasons that DLA itself previously recognized.

Alternatively, putting aside the unreasonable nature of the GAO decision, the specific manner in which DLA has implemented GAO's decision is arbitrary, capricious, and contrary to law. For example, in each of its multiple rounds of evaluations and discussions prior to the initial award to KGL FS, DLA espoused a particular interpretation of the Solicitation's requirements—an interpretation shared by the offerors and against which proposals were developed and revised—that was contrary to GAO's subsequent interpretation. Thus, the appropriate corrective action in response to GAO's decision—if that decision was reasonable— would have been to revise the Solicitation to reflect DLA's original intent and the offerors' contemporaneous understanding. Instead, however, DLA has simply changed its interpretation to match GAO's, and thus rendered its conduct and communications throughout the procurement irrational and unlawful.

For these reasons, and more,[1] KGL FS respectfully requests that this Court sustain this protest and grant the declaratory and injunctive relief requested herein.

## JURISDICTION

1.    This is a bid protest under 28 U.S.C. § 1491(b)(1) challenging the scope of DLA's corrective action under Request for Proposals No. SPE300-15-R-0042 ("RFP" or the "Solicitation").  Accordingly, this Court has jurisdiction over this action.

## STANDING

2.    KGL FS is an interested party with standing pursuant to 28 U.S.C. § 1491(b)(1). KGL FS was the original awardee under the Solicitation and, but for DLA's irrational adoption and implementation of the GAO decision, would retain the contract today.

## PARTIES

3.    Plaintiff KGL FS is a company incorporated in Kuwait.

4.    Defendant the United States at all times relevant hereto has acted through DLA, which is an executive agency of the federal government.

## STATEMENT OF THE CASE

__The SPV Procurement__

5.    The procurement at issue is for Subsistence Prime Vendor ("SPV") food service support for customers located in Kuwait, Iraq, Syria, and Jordan under Solicitation No. SPE300-15-R-0042.  *See* Ex. 1 (Conformed RFP).[2]

---

[1]    Included herein are protective Causes of Action III and IV challenging newly disclosed aspects of DLA's source selection plan and evaluation.  Of course, should the Court rule for KGL FS on its primary argument—that the GAO decision sustaining ANHAM's protest was unreasonable—there would be no need to reach those further grounds.

6.      The RFP, which was issued on December 18, 2015, and was amended 15 times, sought a full-line food distributor responsible for the supply and delivery of food items to approximately 26 military and other federally funded customers located in Kuwait, Iraq, Syria, and Jordan.  *Id.* at 10, 147.

7.      The procurement is being conducted as a FAR Part 12 commercial item acquisition, using FAR Part 15 competitive procedures.  *See id.* at 120-150.  DLA seeks a single indefinite-delivery, indefinite-quantity ("IDIQ") fixed-price contract with economic price adjustment, for 60 months.  *Id.*  The RFP initially provided that the estimated annual dollar value of the contract was $90,237,903.

8.      Award was to be made on a best-value tradeoff basis to the offeror whose proposal was determined to be the most advantageous to the government considering price, past performance, and five technical evaluation factors:

| | |
|---|---|
| Factor I: | Warehouse Location and Capacity |
| Factor II: | Experience |
| Factor III: | Quality Control, Assurance, and Warehouse Management System / Procedures |
| Factor IV: | Resource Availability (Cash Flow, Equipment, and Carrier Agreements) |
| Factor V: | Implementation and Management Plans |

*Id.* at 124.  The RFP provided that each of the technical evaluation factors and past performance were of equal importance to each other, and significantly more important than price.  *Id.* at 145.

**Proposal Submission Requirements**

9.      The RFP provided proposal preparation instructions that directed offerors to submit their proposal in four volumes.

---

[2]      So as not to burden the Court with an overly voluminous initial submission, KGL FS is submitting with this Complaint as Exhibits only those documents that are particularly relevant to the protest grounds stated herein.

10.      In Volume I, the Solicitation required offerors to submit, *inter alia*, "a complete list of [their] affiliates, subsidiaries, and partially or wholly-owned companies that will be utilized for this contract." *Id.* at 127.

11.      In the technical volume, offerors were to submit their response to each of the five technical evaluation factors and the past performance evaluation factor. *Id.* at 127-134.

12.      Relevant here, under Factor II, Experience, the RFP instructed offerors as follows:

> For purposes of evaluating Factor II only, offerors that are proposing a joint venture, partnership or a teaming approach may provide experience information on their team members (e.g. partners, key subcontractors or other affiliates that will perform essential functions of the contract). Offerors that are relying on the experience information of their team members must clearly demonstrate that the team member will have meaningful involvement in the performance of the resultant contract for that experience to be considered. The most relevant experience, and that which will receive the most credit, however, is the information directly related to the offering entity.
>
> Provide a brief performance record of up to five (5) of your highest dollar value and most comparable contracts . . . .  Note: No more than 2 team member contracts may be included in the 5 (selected contracts).

*Id.* at 129.

13.      For the past performance section of the technical volume, the RFP provided the exact same instructions as the instructions provided under factor 2, experience, above. *Id.* at 132. The RFP also provided under past performance that offerors were to have their five contract references fill out past performance questionnaires and submit the completed questionnaires directly to the Agency. *Id.* at 133.

**<u>RFP Evaluation Criteria and Award Basis</u>**

14.      In addition to the proposal preparation instructions, the RFP explained how each non-price factor would be evaluated. *Id.* at 145-150.  Under factor 1, warehouse location and

capacity, the Agency would evaluate (among other things) the location of the offeror's warehouse and facilities, and the risk associated with the offeror's access to and control over the warehouses. *Id.* at 146. In this regard, the RFP stated:

> Proposals containing OCONUS facilities that are owned and existing as well as those with legally-binding long term lease agreements or commitments to enter into a long term agreement that provide full use of facilities conforming to the requirements of the solicitation are likely to result in a higher rating than a proposal containing a proposed or contingent arrangement, or one which provides only partial use of a facility or otherwise raises questions concerning whether the offeror will have complete facilities available or capacity for contract performance when needed. Proposals containing existing facilities that are owned by the offeror will be rated more favorably than those proposals providing facilities that are either under construction or leased due to the lower risk involved with ownership.

*Id.*

15.    Under Factor II, Experience, the government would evaluate the offeror's experience through its written proposal. *Id.* The RFP stated that "[i]f an offeror submits more than 5 comparable contracts, only the 5 highest dollar value contracts will be used for evaluation." *Id.* Furthermore, the RFP stated:

> In establishing what is relevant for experience, consideration will be given to those aspects of an offeror's contract history which provide the most confidence that the offeror will satisfy the current procurement. Those aspects of relevancy include experience performing deliveries as a full line food service distributor, experience performing deliveries in contingency operations, dollar value, and number of customers.

*Id.*

16.    In evaluating Experience, the Agency would assign adjectival ratings of outstanding, good, acceptable, marginal, or unacceptable. These adjectival ratings, and their

corresponding definitions, were not disclosed to offerors; instead, they were identified in the

Agency's internal Source Selection Plan Addendum ("SSPA").

17.    Relevant to this protest, the SSPA defined "Acceptable" for the Experience Factor

as:

> The primary offeror (or team member if applicable) provided
> evidence of experience as a full line food distributor on contracts
> that collectively (if concurrently performed) meet at least 80% of
> the annual dollar value as required by the instant solicitation. The
> primary offeror (or team member if applicable) provided evidence
> of experience performing deliveries in contingency operations on
> contracts that collectively (if concurrently performed) meet the
> number of customers supported on a routine schedule as required
> by the instant solicitation.

*Id*. at 17.

18.    The SSPA defined "Marginal" for the Experience Factor as:

> Collectively, if concurrently performed, the contracts do not meet
> at least 80% of the dollar value requirement of the instant
> solicitation; however, they include full line food distribution in a
> contingency environment in support of the similar number of
> customers supported on a routine schedule as required by the
> instant solicitation.

*Id*.

19.    The SSPA defined "Unacceptable" for the Experience Factor as:

> Primary offeror (and team member if applicable) failed to supply
> evidence of providing full line food service distribution experience
> in a contingency environment for a similar number of customers as
> required by the instant solicitation.

*Id.*

20.    Under Past Performance, the RFP provided that the Agency would "evaluate the

offeror's record of Past Performance through its written proposal, Government in-house records

(if applicable), and information provided by the points of contact or references designated by the

offeror." Ex. 1 at 147.  The RFP also stated that the government may consider past performance

information from sources other than those identified by the offeror.  *Id.* at 148.  The RFP further

explained that there were two aspects to the past performance evaluation: a relevancy

determination and a determination as to how well the offeror performed.  *Id.*  With regard to

relevancy,

> consideration will be given to those aspects of an offeror's contract
> history which provide the most confidence that the offeror will
> satisfy the current procurement requirements. Those aspects of
> relevancy include similarity of experience performing as a full line
> food distributor in contingency operations, dollar value, and
> number of customers supported.

*Id.* at 148.  Based on the past performance ratings for relevant contracts, the Agency would

assign an overall past performance confidence assessment of substantial, satisfactory, limited,

no, or unknown confidence, which ratings were once again defined in the Agency's undisclosed

SSPA.

**Proposal Submissions, Discussions, and Evaluations**

    21.    The Agency received seven proposals by the solicitation's February 8, 2016,

closing date, including proposals from ANHAM and KGL FS.

    22.    The source selection evaluation board evaluated the proposals under the non-price

evaluation factors and identified strengths, weaknesses, and significant weaknesses in each

proposal.

23. ██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████

24. ██████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████

25. ████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████

26. ███████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
███████████

27. ███████████████████████████████████
████████████████████████████████████████
██████████████████████████████

28. ███████████████████████████████████
██████████████████████████████████████████

9

██████████████████████████████████████
████████████████████████████



29.

30.     The Agency's final evaluation of KGL FS' and ANHAM's respective proposals

was as follows:

| Technical Factors | ANHAM | KGL FS |
|---|---|---|
| Warehouse Location and Capacity | Good | Outstanding |
| Experience | Outstanding | Acceptable |
| Quality Control assurance and Warehouse Management System/Procedures | Outstanding | Outstanding |
| Resource Availability (Cash Flow, Equipment and Carrier Agreements) | Good | Good |
| Implementation and Management Plans | Outstanding | Good |
| Overall Technical Rating | Good | Good |
| Past Performance | Satisfactory Confidence | Satisfactory Confidence |
| Evaluated Price | $150,815,549 | $132,288,115 |

Ex. 3 (Source Selection Decision Document) at 5, 10.

31.     The Source Selection Authority ("SSA") reviewed the evaluators' results and

conducted a comparative assessment of the proposals. *Id.* at 1-23.  The SSA determined that



Thus, the SSA concluded that KGL FS'

proposal offered the best value to the Government and, on January 12, 2018, DLA made award

to KGL FS.

**ANHAM's GAO Protest**

32.     On January 29, 2018, ANHAM, which is the incumbent SPV contractor, filed a

GAO protest challenging DLA's award to KGL FS.[3]

33.     ANHAM's protest (and subsequent supplemental protests) attacked virtually every

aspect of DLA's evaluation and award to KGL FS.

---

[3]     Intermarkets Global USA, LLC also protested KGL FS' award; however, GAO dismissed
that protest. *See Intermarkets Global USA, LLC* , B-415969.2, B-415969.4, Mar. 9, 2018, 2018
CPD ¶ --.

34.      GAO ultimately denied all but two of ANHAM's wide-ranging allegations, both under Factor II, Experience.  Thus, only those two allegations are relevant here.

35.      First, ANHAM alleged that the Solicitation's proposal instructions limited DLA to considering no more than two contracts performed by an offeror's "team members," which phrase ANHAM interpreted as including an entity's parent company and/or corporate affiliates, as well as other team members.  ANHAM then argued that DLA violated that supposed limitation by evaluating five contracts performed by members of KGL FS' corporate family and/or KGL FS' team members in this procurement.

36.      Second, ANHAM alleged that it was unreasonable for DLA to "retain" the ███ ███ contract in evaluating KGL FS' experience—even though there was no dispute as to the contract's existence or to the fact that the KGL FS team member that performed the contract had committed its resources to and would perform the SPV contract.

37.      On the first issue, DLA and KGL FS explained to GAO that ANHAM misread the Solicitation and contradicted DLA's broad discretion to evaluate corporate resources that were committed to perform the SPV contract.  For example:

    a.      KGL FS explained that the Solicitation used the term "affiliate" in two different places to reference two distinct types of affiliates—those that are members of the same corporate family (*e.g.*, the KGL entities) and those proposed by the offeror to be team members or team members' affiliates (*e.g.*, affiliates of subcontractors, non-key subcontractors).  *See* Ex. 4 (Mar. 28, 2018 KGL FS Comments) at 17-20.  On the one hand, the Solicitation required inclusion in Volume I of "a complete list of your affiliates, subsidiaries, and partially or wholly owned companies that will be utilized for this contract."  Ex. 1 at 127.  On the other hand, in the instructions for Factor II, the

Solicitation stated that, "*offerors that are proposing a joint venture, partnership or a teaming approach* may provide experience information on their team members (*e.g.*, partners, key subcontractors *or other affiliates* that will perform essential functions of the contract)," and limited offerors to proposing "[n]o more than 2 team member contracts may be included in the 5 (selected contracts)." *Id.* at 129 (emphasis added). ANHAM's reading, however, failed to interpret the Solicitation as a whole and to "give reasonable meaning to all of [the Solicitation's] parts"—including the Solicitation's multiple references to "affiliates."

b.      DLA, meanwhile, explained that, even focusing solely on the Solicitation's second reference to affiliates, that reference was limited by the preface that "other affiliates" only applied to "offerors that are proposing a joint venture, partnership or a teaming approach," such as with the immediately previously referenced "partners" and "key subcontractors." DLA further explained that ███████ ██ ████████



Ex. 5 (Mar. 23, 2018 Supplemental Agency Report) at 47.

13

c.    DLA also explained that ANHAM's allegation was contrary to well-settled precedent that an agency may consider the performance of an offeror's corporate affiliates where those affiliates have committed resources to perform the contract at issue. Moreover, DLA summarized the numerous examples of such commitments in KGL FS' proposal:



████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

Ex. 5 (Mar. 23, 2018 Supplemental Agency Report) at 46-47.

38.     On the second issue, KGL FS and DLA explained that, in light of the significant

deference afforded to agencies in evaluating experience and past performance, and under the well-

established "close at hand" doctrine, DLA's decision to "retain" the ███████ contract was

reasonable.  Having received full information regarding the ███████ contract through KGL

FS' proposal in this very procurement, DLA was undeniably aware of the effort and could not

simply ignore that information in its evaluation.  Additionally, DLA explained that, even if the

information were not required to be considered under the "close at hand" doctrine, the

Solicitation in this case also specifically permitted DLA to consider this information:

> [T]he Solicitation's evaluation criteria made clear that DLA Troop
> Support anticipated that offerors could submit more than five
> comparable contracts.  (Tab 19 at 129; 146).  The Solicitation's
> evaluation criteria specifically provided that "if the offeror submits
> more than 5 comparable contracts, only the 5 highest dollar value
> contracts will be used for evaluation."  Id. at 146.  Thus, DLA
> Troop Support advised offerors that where more than five
> reference contracts were submitted, the Agency would limit its
> review to the five highest dollar value comparable contracts.  Id.
> That is exactly what the SSEB did here.  The SSEB reviewed the
> reference contracts provided by KGL, determined the five highest
> dollar value comparable contracts submitted by the time of final
> proposal revisions, and evaluated the experience under those
> contracts accordingly.  (Tab 58 at 65.)

Ex. 5 (Mar. 23, 2018 Supplemental Agency Report) at 50.

39.     Notwithstanding these thorough explanations, GAO sustained these two—and only

these two—aspects of ANHAM's protest.  *See* Ex. 6 (*ANHAM FZCO*, B-415969, .3, .5 (May 8,

2018)).  GAO interpreted the Solicitation as precluding DLA from considering more than two of

████████████████████████████████████████████
████████████████████████████████

an offeror's corporate affiliate contracts in the Factor II Experience evaluation, and GAO held that DLA should not have "retained" and considered the ████████ contract. *Id.* at 9-11.

40.     In its decision, GAO recommended that DLA either (1) reevaluate KGLFS' final proposal under the experience factor in accordance with GAO's interpretation of the Solicitation or (2) revise the solicitation to reflect the agency's intended requirements and obtain revised proposals. *Id.* at 17.

**DLA's Request for Clarifications Based on the GAO Decision**

41.     On May 29, 2018, DLA sent KGL a "Request for Clarifications based on GAO decision dated May 8, 2018; file numbers B-415969, B-415969.3, and B-415969.5." *See* Ex. 7. DLA's Request stated that, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ██ ███

42.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████ ██ ███

43.     DLA did not provide any explanation as to why it was adopting GAO's interpretation of the Solicitation; nor did DLA explain why it did not revise the Solicitation to be consistent with DLA's professed interpretation throughout the procurement (including, *inter alia*, DLA's discussions with offerors) and throughout the GAO protest.

16

████████████████████████████████████████████

████████████████████████████████████

44.     DLA's Request also included a footnote indicating that ████████████

████████████████████████████████████████████████████

████████████████████████████



*Id.* at 1 n.1.

45.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████

46.     DLA originally requested that KGL FS respond to its Request for Clarifications by June 5, 2018.  However, because the GAO decision on which the Request was based was not yet publicly released, KGL FS requested additional time to respond to DLA's Request.  DLA ultimately extended the deadline for KGL FS' response to June 12, 2018 by 12:00 Noon, local Philadelphia time.  GAO released the public version of its decision on June 7, 2018.

47.     KGL FS timely files this protest prior to the deadline for the submission of its response to DLA's corrective action "Request for Clarifications."

████████████████████████████████████████████████

████████████████████████████████

## CAUSES OF ACTION

## COUNT I

## ARBITRARY AND CAPRICIOUS RELIANCE ON FLAWED GAO DECISION

48.    KGL FS realleges and incorporates by reference each and all of the allegations above, as if fully set forth herein.

49.    Where an agency reopens a procurement or otherwise takes remedial action following a sustained GAO protest, the underlying GAO decision is subject to review.  And if the GAO decision is irrational, then so too is the agency's consequent action.  *See, e.g.*, *DZSP 21, LLC v. United States*, No. 18-86C, 2018 WL 1530654, at *7 (Fed. Cl. Mar. 22, 2018) (overturning corrective action evaluation that adopted earlier flawed GAO interpretation); *Firth Constr. Co.*, 36 Fed. Cl. at 271-72 (holding agency's reliance on flawed GAO decision was itself irrational); *see also, e.g.*, *Honeywell Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("a procurement agency's decision to follow the [GAO] recommendation . . . was proper unless the Comptroller General's decision itself was irrational").

50.    Here, on both issues where GAO sustained ANHAM's protest, GAO misinterpreted the Solicitation and/or ignored the Agency's highly discretionary evaluation judgment.  Thus, DLA's adoption of and reliance on the GAO decision to take corrective action and undo the award to KGL FS is arbitrary and capricious and must be overturned.

51.    First, GAO's conclusion that a single reference in the Solicitation to "team members" necessarily included an offeror's entire corporate family and precluded DLA from considering more than two reference contracts from any such entities was patently unreasonable. *Inter alia*:

a.      GAO misinterpreted the Solicitation.  In ignoring the Solicitation's multiple distinct references to "affiliates" and the Solicitation's limiting preface before the phrase "other affiliates," GAO failed to read the Solicitation as a whole and failed to give reasonable meaning to all its parts.  *See, e.g.*, *NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (explaining that a solicitation "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts"); *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006) ("A reasonable interpretation must 'assure that no contract provision is made inconsistent, superfluous, or redundant.'" (quoting *Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997))).  Indeed, GAO's interpretation does not "give reasonable meaning to all of [the Solicitation's] parts" because, if in the phrase "team members (*e.g.*, partners, key subcontractors or other affiliates that will perform essential functions of the contract)," the term "affiliate" means *corporate* affiliate, the word "other" becomes surplusage.  Stated differently, to give meaning to the word "other," in "other affiliates," that term must mean affiliates in the non-corporate sense by reference back to "partners" and "key subcontractors."  GAO's interpretation, however, violates this fundamental rule of contract interpretation.

b.      GAO's interpretation of the Solicitation is overly restrictive of competition and contrary to well-established GAO and COFC precedent.  Both GAO and the Court have routinely recognized that "[a]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliate will affect the performance of the offeror."  *E.g.*, *Sys. Eng'g Partners, LLC*, B-412329, B-412329.2,

19

Jan. 20, 2016, 2016 CPD ¶ 31 (citing *Perini/Jones, Joint Venture*, B-285906, Nov. 1, 2000, 2002 CPD ¶ 68); *see also, e.g.*, *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 193 (2014) ("An agency may attribute the experience or past performance of a parent or affiliated company, if the offeror merely, in the proposal or otherwise, demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." (internal quotations and citations omitted)), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015); *Femme Comp, Inc. v. United States*, 83 Fed. Cl. 704, 747 (2008) (holding agency properly credited awardee with resources of corporate parent and affiliates even though those entities were not expressly listed as subcontractors in awardee's proposal, because "there is no requirement that an offeror must designate its affiliated corporations as subcontractors in order to officially commit their resources to the performance of a contract"); *T & S Prods., Inc. v. United States*, 48 Fed. Cl. 100, 111 (2000) ("The agency involved enjoys the freedom to take subsidiaries at their word that their parent corporations' resources will be available . . . ."). The rationale for this rule is that that the evaluation of experience and past performance is committed to agency discretion, and agencies are entitled to assess offerors' experience and past performance so long as the resources involved will be committed to perform the contract at issue. *See Am. Auto Logistics, LP*, 117 Fed. Cl. at 189 (citing *PlanetSpace Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010)). Here, KGL FS' corporate affiliates committed their resources to the SPV contract and will be an integral part of contract performance. Indeed, DLA itself summarized the numerous examples of such commitments in KGL FS' proposal. Ex. 5 (Mar. 23, 2018 Supplemental Agency Report) at 46-47. In evaluating ANHAM's protest, however, GAO unreasonably ignored the details of KGL FS' proposal and the

definite commitments made by its corporate parent and affiliates.  *See* GAO Decision at 11-12.  Thus, GAO's decision was unreasonable.

        c.        Even assuming *arguendo* that GAO's interpretation of the Solicitation's requirements was reasonable (KGL FS maintains that it was not), GAO unreasonably ignored the fact that the Solicitation was ambiguous and there existed a second reasonable interpretation: that espoused by KGL FS and DLA and followed by KGL FS and DLA throughout the procurement.  Moreover, GAO failed to consider that, where such an ambiguity exists, an offeror is entitled to rely on its reasonable interpretation of the Solicitation—which KGL FS did here, relying on an interpretation shared by DLA— and there is no basis to eliminate that offeror's proposal or hold that it failed to comply with the Solicitation.  Thus, for this reason, as well, GAO's decision sustaining ANHAM's protest was unreasonable.

52.      Second, GAO's conclusion that DLA could not consider the ████████ contract in evaluating KGL FS' proposal was also unreasonable.

        a.        It is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference'" *Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. 765, 785 (2011) (citations and quotations omitted), and a past performance evaluation "'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'"  *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 23 (2009) (quoting *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 637 (2005)).  In a negotiated procurement, as here, "the greatest deference possible is given to the agency—what [the] Court has called a 'triple whammy

of deference.'" *Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 48 (2011) (quoting *Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004)).

      b.      Similarly, both GAO and the COFC have recognized the "close at hand" doctrine, whereby an agency may not ignore information regarding prior contract performance where that information is specifically known to the agency and bears on its present evaluation decisions. *See, e.g.*, *Shaw-Parsons Infrastructure Recovery Consultants, LLC; Vanguard Recovery Assistance, JV*, B-401679.4 et al., Mar. 10, 2010, 2010 CPD ¶ 77 at 8 (sustaining protest where agency failed to reasonably consider past performance information in its possession as part of the evaluation of offeror's proposal); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 568 (2000) ("some information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain and consider the information" (citations and quotations omitted)); *see also, e.g.*, *Nuclear Production Partners, LLC; Integrated Nuclear Product Solutions, LLC*, B-407948 *et al.*, Apr. 29, 2013, 2013 CPD ¶ 112 (applying the "close at hand" doctrine to corporate experience, finding no logical basis for requiring an agency to consider "close at hand" information when evaluating an offeror's past performance but precluding it from similarly considering such information in evaluating an offeror's corporate experience).

      c.      Here, GAO unreasonably ignored the "close at hand" doctrine and eschewed the "triple whammy of deference" that should have been afforded to DLA's contemporaneous evaluation. Having received full information regarding the █████ contract through KGL FS' proposal in this very procurement, DLA was undeniably aware of the effort and could not simply ignore that information in its evaluation.

d.      Additionally, as DLA explained to GAO, even if the information were not required to be considered under the "close at hand" doctrine, the Solicitation in this case also specifically permitted DLA to consider this information.  Ex. 5 (Mar. 23, 2018 Supplemental Agency Report) at 50 ("The Solicitation's evaluation criteria specifically provided that "if the offeror submits more than 5 comparable contracts, only the 5 highest dollar value contracts will be used for evaluation." (quoting Conformed RFP at 146)).  For this reason, as well, GAO's decision was contrary to binding precedent, common sense, and the Solicitation, and there was no basis to sustain ANHAM's protest.

53.      For each of these reasons, as explained throughout this Complaint, GAO's decision was unreasonable as to both of the issues on which it sustained ANHAM's protest.  Thus, DLA's decision to adopt GAO's decision and re-open the procurement is inherently arbitrary and capricious, and this protest must be sustained.

## COUNT II

## ARBITRARY, CAPRICIOUS, AND UNLAWFUL IMPLEMENTATION OF GAO DECISION

54.      KGL FS realleges and incorporates by reference each and all of the allegations above, as if fully set forth herein.

55.      For the reasons addressed in the preceding sections, GAO's interpretation of the Solicitation was unreasonable in light of the applicable facts and law.  However, even if GAO's interpretation was *a* reasonable interpretation—*i.e.*, that corporate affiliates could potentially be considered team members—it is certainly not the *only* reasonable interpretation.  Indeed, DLA and the offerors espoused another reasonable interpretation throughout the procurement: that corporate affiliates are *not* "team members" in the sense of the Solicitation's proposal instruction restrictions.

56.     Given this shared DLA and offeror interpretation throughout the procurement, even if GAO was reasonable in sustaining ANHAM's protest (which it was not), the appropriate remedy cannot be the limited "Request for Clarifications" that DLA has provided to KGL FS. Rather, as even GAO recognized the Agency could do, DLA should amend the Solicitation to reflect its actual intent and requirements—*i.e.*, that corporate affiliate experience and past performance[4] would be broadly considered.  *See* GAO Decision at 17 (recommending that DLA could "revise the solicitation to reflect the agency's requirements").  Such an amendment would eliminate any confusion from the Solicitation and would comport with DLA's and the offerors' understanding all along.

57.     By contrast, if DLA does not amend the Solicitation—and if DLA instead persists in its "Requests for Clarifications" implementation of GAO's flawed interpretation—then DLA will have unduly restricted competition and conducted misleading and less than meaningful discussions with the offerors.  To the former point, DLA will have unreasonably limited competition by penalizing offerors such as KGL FS who stand ready, willing, and able to perform, but will rely in large part on the experience and resources of their corporate affiliates as is customary practice in such significant contracts.  *See, e.g.*, 10 U.S.C. § 2304 (requiring, with limited exceptions, that agencies procure goods and services through full and open competition); FAR 12.301(a) (providing that "contracts for the acquisition of commercial items shall, to the

---

[4] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████

maximum extent practicable, include only those clauses (1) [r]equired to implement provisions

of law or executive orders applicable to the acquisition of commercial items; or (2) [d]etermined

to be consistent with customary commercial practice").  To the latter, each of the multiple rounds

of discussions that DLA conducted with KGL FS up to this point will have been misleading and

less than meaningful, as DLA will never have advised KGL FS of DLA's new, limited

interpretation of the Solicitation, which results in an adverse evaluation of KGL FS' proposal.

*See, e.g.*, FAR 15.306(d)(3) (requiring that, "[a]t minimum, the contracting officer must . . .

indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant

weaknesses, and adverse past performance information to which the offeror has not yet had an

opportunity to respond").

58.    On this issue of misleading and less than meaningful discussions, the recent

decision in *ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188 (2018), is particularly instructive.  In

that procurement, GAO sustained a protest challenging DLA's interpretation of particular

solicitation requirements.  When DLA then took corrective action to implement GAO's new

interpretation, Judge Wolski rightly explained that DLA's newfound adoption of the GAO

interpretation undermined its prior rounds of discussions with offerors.  *Id.* at 203 ("[T]he Air

Force, DLA, and the GAO all failed to consider that the GAO interpretations amounted to a

'tightening' of the requirements relative to their meaning during discussions.  The Court agrees

with plaintiff's contention that, under these circumstances, it was arbitrary for the government

not to reopen discussions . . . ."); *id.* at 208 ("the retroactive imposition of this definition results

in the discussions being arbitrary and unfair").

59.    Here, as in *ARxIUM*, having conducted multiple rounds of discussions with KGL

FS espousing one interpretation of the Solicitation's requirements, DLA cannot simply reverse

course, adopt GAO's contrary interpretation, and require that KGL FS clarify its proposal that was shaped in large part by KGL FS' prior exchanges with DLA. Instead, DLA is required to clarify its intent and requirements through an amendment to the Solicitation, and to allow offerors to revise their proposals as necessary to address that amendment.[5]

60.      For this reason, as well, this protest should be sustained.

## COUNT III

## ARBITRARY, CAPRICIOUS, AND UNDULY RESTRICTIVE UNDISCLOSED EVALUATION CRITERIA

61.      KGL FS realleges and incorporates by reference each and all of the allegations above, as if fully set forth herein.

62.      During the GAO protest, DLA produced under the Protective Order its SSPA, which identified the adjectival ratings and corresponding definitions that DLA used in evaluating offerors under Factor II, Experience. Neither the SSPA nor those adjectival ratings and definitions were disclosed to offerors during the procurement (although the definitions of "Acceptable" and "Marginal" have now been disclosed in the public GAO decision).

63.      Although DLA has not yet reevaluated KGL FS' Experience proposal in its present corrective action—and KGL FS maintains that it is entitled to the Acceptable rating it originally received—should the Court allow DLA to continue its corrective action, there is an

---

[5]      Given that such Solicitation clarification would be minimal—indeed, it would simply memorialize the same interpretation DLA held and communicated to offerors throughout the procurement—DLA could reasonably limit proposal revisions to only aspects affected by the Solicitation clarification, if any. *See, e.g.*, *Intermarkets Global*, B-400660.10, B-400660.11, Feb. 2, 2011, 2011 CPD ¶ 30 (upholding DLA decision to limit proposal revisions during corrective action on previous SPV procurement); *see also, e.g.*, *Amazon Web Servs., Inc. v. United States*, 113 Fed. Cl. 102 (2013) (holding agency could not reasonably allow price revisions after offeror's original pricing had been disclosed and initial errors did not necessitate price revisions); *Sheridan Corp. v. United States*, 95 Fed. Cl. 141 (2010) (same).

ambiguity in the SSPA definitions that must be corrected.  Specifically, there are at least three problems with the SSPA definitions of "Marginal" and "Unacceptable."

      a.    First, the "Marginal" and "Unacceptable" definitions are irrational in light of the corresponding definition of "Acceptable."  To achieve an Acceptable rating, an offeror had to demonstrate, *inter alia*, "experience as a full line food distributor" and "experience performing deliveries in contingency operations."  SSPA at 17.  However, to achieve the lesser definition of "Marginal," or, conversely, to *not* receive the lowest rating of "Unacceptable," an offeror had to demonstrate "full line food service distribution in a contingency environment."  *Id.* ("Marginal" definition; similar wording in "Unacceptable" definition).  This latter requirement is conjunctive, and objectively more restrictive than the definition for "Acceptable."  Indeed, an offeror could theoretically demonstrate both "experience as a full line food service distributor" and "experience performing deliveries in contingent operations," but not within the same contract.  In that case, it would seemingly merit both an "Acceptable" and "Unacceptable" definition.  While this is almost certainly an inadvertent error in the SSPA, such an inconsistency is inherently irrational, and must be revised.

      b.    Second, the "Marginal" and "Unacceptable" definitions are inconsistent with the manner in which DLA has interpreted and portrayed them to offerors throughout the procurement.  When the Agency has assigned offerors less than Acceptable Experience ratings throughout this procurement, it has generally, if not universally, done so based on the size and scope of those offerors' relative experience vis-à-vis the SPV requirements, rather than on whether they demonstrated any singular contract evidencing simultaneous "full line food distribution in a contingency environment."  This further

27

establishes that DLA never intended its requirements to be interpreted as strictly as drafted, and thus that they must be revised.

      c.     Third, the "Marginal" and "Unacceptable" definitions, if strictly interpreted, would be unduly restrictive of competition.  The Competition in Contracting Act requires agencies to engage in full and open competition to the maximum extent practicable.  10 U.S.C. § 2304; *see also, e.g.*, FAR 12.301(a).  To that end, an Agency may not impose unnecessarily strict requirements that would preclude offerors from competing.  However, if the Agency were to interpret the undisclosed SSPA definitions in the strictest manner possible, then the Agency could potentially exclude nearly all companies other than incumbent SPV contractors from competing for this contract.  As there is no legitimate basis for such an exclusion, and the Agency has proffered none here, this further demonstrates that these undisclosed definitions must be revised or abandoned.

64.     For each of these reasons, should this Court not sustain KGL FS' protest and enjoin DLA from proceeding with its corrective action, DLA must at a minimum revise and/or abandon these flawed definitions prior to reevaluating offerors' proposals.[6]

## COUNT IV

## ARBITRARY AND CAPRICIOUS EVALUATION OF KGL FS PROPOSAL

65.     KGL FS realleges and incorporates by reference each and all of the allegations above, as if fully set forth herein.

---

[6]    Because the SSPA definitions were not disclosed to offerors at any point before submission or revision of proposals, revising and/or abandoning the definitions now would not *per se* give rise to any flawed discussions concerns—as DLA's other changed Solicitation interpretations have.  Any revisions that would be inconsistent with the conduct of discussions would, however, still give rise to such concerns.

66.     As with Count III, should this Court not sustain this protest and find DLA's reliance on and implementation of the flawed GAO decision was not unreasonable, then DLA must take additional steps to ensure that any corrective action is reasonable.  Relevant to this Count IV, DLA must reevaluate ███████████████████.

67.     As noted above, DLA's May 29 "Request for Clarifications" (at 1 n.1), states that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████████

68.     ████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████

69.     █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

        a.      ████████████████████████████████████████
                ████████████████████████████████████████
                ████████████████████████████████████████
                ████████████████████████████████████████
                ████████████████████████████████████████
                ████████████████████████████████████████
                █████████████████████████████████
                ████████████████████████████████ ██████████
                ████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ █████████████████

████████████████████████████

b.   ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

70.   ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████



71. ████████████████ ████████ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ████████ ████████████████████

████████████████████████████████████████████████

████████████████████████████

72.     For each of these reasons, should this procurement continue, DLA must either

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**BASIS FOR INJUNCTIVE RELIEF**

73.     Each and all of the arbitrary and capricious actions discussed above merit

sustaining KGL FS' protest.  KGL FS has also satisfied the remaining requirements for

permanent injunctive relief.

████████████████████████████████████████████████

████████████████████████████████████

74.     KGL FS will be irreparably harmed and have no adequate remedy at law if injunctive relief is not granted.  Specifically, absent an injunction as requested herein, KGL FS will be forced to recompete for a contract it already won, and at a potential disadvantage given DLA's adoption of the GAO's unreasonable Solicitation interpretations.

75.     If this Court were to grant KGL FS' requested relief, the Government would suffer no harm, as DLA already rationally determined that KGL FS' proposal represented the best value to the Government and awarded the contract to KGL FS.  Sustaining KGL FS' protest would effectively reinstate DLA's own best value award decision.  Accordingly, the balance of the harms favors KGL FS.

76.     The public interest also favors the granting of injunctive relief.  There is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations and to ensure that award decisions are not otherwise arbitrary and capricious, or the product of an abuse of discretion.  That overriding purpose would be served here, where DLA rationally evaluated offerors' proposals in accordance with the Solicitation and applicable procurement statutes and regulations, and GAO lacked any rational basis to sustain ANHAM's protest.

77.     Accordingly, all factors favor KGL FS and the granting of injunctive relief.

**REQUEST FOR RELIEF**

KGL FS respectfully requests this Court to enter judgment in favor of KGL FS and to provide the following relief:

a.  A declaratory judgment that DLA's adoption of GAO's flawed May 8 decision is inherently arbitrary and capricious, and an injunction requiring DLA to reinstate its original, rational award to KGL FS; or, in the alternative,

b.  A declaratory judgment that DLA's implementation of the May 8 GAO decision and recommendation is arbitrary and capricious for the various reasons stated herein; and an injunction requiring DLA to revise the Solicitation to reflect DLA's requirements and intent—as disclosed to offerors—throughout this procurement; and

c.  Such other relief as the Court may deem just and appropriate or to which KGL FS is otherwise entitled.

June 12, 2018                         Respectfully submitted,

                                      s/ John E. McCarthy Jr.
                                      John E. McCarthy Jr.
Of Counsel:                               (Counsel of Record)
                                      Crowell & Moring LLP
David C. Hammond                      1001 Pennsylvania Avenue, NW
Mark A. Ries                          Washington, DC 20004-2595
Robert J. Sneckenberg                 Tel: (202) 624-2579
Sharmistha Das                        Fax: (202) 628-5116
Charles Baek                          JMcCarthy@crowell.com

*Attorneys for KGL Food Services WLL*